Thank you. And case number four, which is 21-30-98, Andrew Dunlevy v. James Langfelder. Oh, Mr. Baker. Hello again. Hello. It seems like it hasn't been quite so long this time. It's Baker Day. I suppose. I suppose. I'm here today on behalf of Andrew Dunlevy, and we are asking this court to reverse a grant of summary judgment that was entered against him by the district court. This is a race discrimination claim, reverse race discrimination claim. There are actually three separate components to it. There's one brought under Illinois law, one brought under Title VII, and one brought under the Constitution. The standards that this court uses in evaluating those claims are effectively the same. So the arguments really apply across the board. What happened in this case was Mr. Dunlevy was hired by the city of Springfield to be an inspector, a water meter inspector. At effectively the same time, I believe it was one week earlier, another individual by the name of Tour Murray, an African-American gentleman, was hired as the same exact position. They both entered into their work as probationary employees, probationary status in their jobs. And under the city of Springfield ordinance, that means that during the first year of their employment, they can be fired at any point in time. They have no civil service protections under the city. It's effectively an at-will employment during that period of time. Once they complete that probationary period, they do have job protections in their position, and they have a right to challenge any discipline or termination to the Civil Service Commission. One of the individuals who was involved in the process here, Mr. Ott, he said the purpose of the probationary period is really to get a sense of, is this the kind of person who we want to work for? That's really the standard that they are looking for. Well, so over the course of almost a year, both Mr. Dunleavy and Mr. Murray worked, and at the end of their respective probations, their supervisors, their supervisory chain, put together memorandums recommending that both of them be released prior to their probationary term expiring. Now, these were very, very low-level positions, and this was approved, I believe, by five supervisors in the line up above them, and approved by Human Resources, and I believe also approved by the legal department at the agency, or excuse me, at the city. It got to the mayor in this case, James Langfelder, and he said, no, what we're going to do is we're going to terminate Dunleavy, but we are going to, or I am going to, extend the probationary term of Mr. Murray. Mr. Baker, I'm going to interrupt you because I promise you we have read every word of the briefs, and I think we should try and ask some questions if you don't mind. I certainly don't mind at all, Your Honor. Let's say you're right, that Mr. Murray was a legitimate comparator, and that the district judge erred in granting summary judgment on that basis. Do you agree that a jury would then be free to decide that Mr. Murray's conduct was not substantially similar to Mr. Dunleavy's conduct? I believe a jury could be able to, and let me parse that a little bit. For starters, this court has said that the jury is not instructed on the Prima Facie case, so I don't know that they would be given that as a specific instruction. But I certainly think that an argument could be made, and I think an argument could be made by the mayor at trial as to why he saw the two as not being similar. But the question here is the Prima Facie case. And was the misconduct of the two men distinct in terms of its effect on customers? I don't believe so. You know, I think that we're really nitpicking if we get down to that point. You know, my client, the issues that he had, there were a couple of times, I believe there were seven instances where he had coded in the wrong reading on the meter. He would go out and read water meters every month, and so the bills would be off, they would get caught back up. So the impact on a customer, I believe, was fairly minimal. Ultimately, they might have to pay a little more or a little less one month, but at the end of the day, it all evened out. The conduct of Mr. Murray, I think, is far more troubling in this case. I mean, this was a man who was given license to go into these customers' homes, into their basements to check their water meters, but he was a convicted felon, convicted of burglary. And so if, I am a customer of CWLP, and I think I would have a lot more concern about a burglar coming into my home, a convicted felon burglar coming into my home, than I would about a meter reading being off. And so I do think that the effects are of comparable seriousness. But I also think what's important is to look at the standard when we talk about comparability. And again, there are a few factors that need to be considered. Number one, this is on the Prima Facie case. And the Prima Facie case, the Supreme Court has said, this court has said, is not intended to be an onerous hurdle for a party or for a plaintiff to get over. It's not intended to be that way. The second thing that needs to be understood is that this particular question of what is a, whether they are comparable, this court and other courts who have addressed the issue have said, that's a question of fact for a jury. And it shouldn't be taken out of a jury's hand unless it is clear. So in my view, this is an argument. This is absolutely an argument that the mayor could make at the city, or excuse me, at a trial. But to decide it as a matter of law, I think, is where the error comes in. And I think that this is consistent with this court's holding in the Coleman case. But I also think, on the similarly situated, going back to Mr. Ott's statement, the question is, we have this probationary period where we want to look, or the city wants to look and says, are these the type of people who we want to keep on? And in Mr. Dunleavy's case and Mr. Murray's, five supervisors and human resources all said, no, we want to get rid of both of them. So to them, to those individuals who were employed by the city and entrusted with making these decisions, they both did engage in comparably serious behavior that determined that they should not have continued employment. So based upon that, the fact that their supervisors concluded that these instances were of comparable seriousness, makes it seem pretty clear that a jury could reasonably make that assumption. I apologize. How do you, you suggest in the briefs, and you do just now, that we can infer that Dunleavy and Murray were subjected to the same standard because their supervisors recommended the same punishment, termination. Yes. How are those recommendations an indication of the standard applied? And how are those recommendations an indication of a finding that the conduct is similar? I can see the recommendation is similar. How do you know what went into the machine is considered similar? Well, the similarly situated prong is different, and I think in Coleman, this court made it clear that we look at instances of comparable seriousness. And I think that that's really the proper term, and the Coleman decision is very, very helpful because it explains that this similarly situated prong has been used by courts over and over again to shut the door on litigants as opposed to allowing them to come in. And so when we look at the standard of how are they of comparable seriousness, when we're using that as the standard, what we have is the question is, is this somebody we want here? That is the standard. There are no rules. The city hasn't produced rules that say, you know, under this particular provision, it's a five-day suspension. Under this particular provision, it's a 15-day suspension. There are no rules that have been provided. There's been no indication that anybody ever conducted an investigation where they talked to Dunleavy about the allegations against him. There's no indication that either of them were ever warned about either of these things. So the standard that was used or the standard that was used by the city in making its determination is what Mr. Ott said. Is this the type of person we want to keep around? And when we look at comparable seriousness, issues of comparable seriousness, we see a very different result, even though everybody along the chain found them to be of comparable seriousness that warranted their termination. So that's how I would apply the standard, Your Honor. Okay. All right. I see I'm down to 25 seconds. Well, you know, you're with Lady Bountiful. I'll give you a couple of minutes. Well, that's fine. I do appreciate it. I thank you. And unless there are any more questions right now, I'll reserve the balance of my time. Thank you. Thank you. Thank you very much. All right. Oh, boy. Okay. Hello, Mr. Hogue. Good morning, Your Honors. Still morning. My name is Robert Hogue. I am here representing the Pelleys, City of Springfield, and Mayor James Lengfelder. So may it please the court and may it please opposing counsel. I'd like to start by initially addressing the questions asked of opposing counsel, and specifically the first one about the seriousness of the conduct and how it impacts customers. This wasn't just a once-in-a-while thing, and it had a pretty substantial impact on customers. Well, it is true that they didn't engage in precisely the same type of misconduct. But don't both types of misconduct represent a fundamental failure to do the specific job for which they were hired? I mean, one is falsifying allegedly meter readings, and the other isn't showing up to take meter readings. With all due respect, Your Honor, they are substantially different. And the fact that, as you said, one is falsifying meter readings, which created an undue influence upon clients. One customer had to pay a $500 bill unexpectedly. The other one is misuse of time, which may or may not have an impact on job performance. It usually does, though not always. And in fact, this court has previously held that falsifying documents is not the same as showing up to court under the influence of alcohol. And I think that kind of distinction there highlights this distinction here. And how about Mr. Murray's burglary conviction? Doesn't that also have a tremendous potential to affect customers? I mean, I think, you know, they're unaware that he, you know, had this conviction. And they're taking it into their home. Sure. As the mayor testified in his deposition, that generally the city doesn't take much stock into convictions that are more than 70 years old at the time of hire. Furthermore, it was his understanding that the Department of Human Resources had already fully vetted out both candidates and had made the determination on their end that this conviction was not going to be a complete prohibition to Murray's employment. I want to go back to comparing the actions with regard to meters. So you've got on the one hand Dunleavy falsifying meters. My understanding about the allegations against Murray were that he was dilatory, showing up late, taking long lunch breaks. Was there any accusation in the record that he was in fact failing to read meters? Thank you very much for that question, Your Honor. And no, there is not a bit of evidence in the record that shows that Murray was performing his job poorly or failing to read any meters. And I would like to highlight that reading these water meters is the core function of both of their jobs, literally in their job titles, is water meter reader. And this court has previously held that failing to observe the core function of the job is a fireball offense. When talking about a postal carrier who failed to deliver mail, and I think that's pretty similar here. And when a water meter fails to actually read the water meters, that's a core function of his job. And thus the city would have every right to fire that person. Whereas, yes, a misuse of time can impact job performance, but not necessarily. And there is no evidence in this case that in fact Murray's job performance was negatively impacted by his misuse of time. In other words, you're saying that he can work four hours or six hours instead of the eight that he's paid for. And as long as he gets his meters read, nobody cares. Is that what you're saying? Not necessarily, Your Honor. And in this case specifically, it's not that Murray was let off scot-free of everything. His probation actually, and to correct opposing counsel's statement, the probation term is actually six months. And so Murray's probation time frame was actually extended based on his conduct. And he was given retraining and pushed to have more, to actually better use his time up. To be on time more often, to not leave for lunch early, and to stay until his hours are complete at work. So it's not that he was let off scot-free. But what's your response to Mr. Baker, who argues that really what we're looking at when it comes to probation is a standard. Are these folks that we want to keep around on a permanent basis? And, you know, therefore, it's enough to get to a jury and let the jury figure out the rest about whether they are really similarly situated. Yeah, so that happens to be one of the supervisor's statements directly. And yes, the recommendation of the entire chain up until you reach the mayor was that both parties be terminated. The mayor ultimately made his decision based upon the facts that he wanted to have Murray retrained. And he wanted Dunleavy fired. But also another statement made by the supervisors was that regardless of whether or not employees are on probation, falsifying meter readings is an immediately fireable offense. It doesn't matter if they've been there for three months or 30 years. Falsifying meter readings is an immediately fireable offense. Even if the person perhaps, I mean, I'm not sure I understand why you have to retrain someone who's taking extra time for lunches and just not showing up. I don't know what you're retraining there. But perhaps someone who has these errors does need retraining. Perhaps he just is missing something. That to me seems like more of a, you know, issue that could really do very well from some extra training. As I stated, Your Honor, it's the city's position that falsifying meter readings is always a fireable offense, regardless of how long they've been there, whether or not they're on probation or certified. And furthermore, it's not the court's concern that an employer may be wrong about the employee's performance or whether or not it's too hard on Dunleavy and not hard enough on Murray. But rather the only question present before the Court is whether the employer's proffered reason is pretextual. In other words, whether or not the employer's proffered reason is a lie. And here we have a legitimate concern for falsifying records when it has a direct ... We haven't gotten there yet. We're using McDonnell Douglas and we're way, you know, we're much more forward than pretext to the analysis, are we? Evidence ... We're just talking about whether he's a comparator or not. Correct, Your Honor, but evidence ... It's usually a question of fact. I'm sorry. It's usually a question of fact. Sure, Your Honor, but this Court has also held that evidence towards whether or not there's a similar situated employee also tends to establish evidence for a pretext analysis. And that comes from Gates v. Caterpillar from this very Court in 2008. Here's the problem that I am having. You said in the brief that it was Mr. John Levy's obligation in the first instance to establish that the mayor was aware of their races. Where does McDonnell Douglas say that this is part of a plaintiff's prima facie case? It comes up in some number of cases, and I agree with you that if a defendant, you know, produces evidence that the decision maker was unaware of the race of the plaintiff and or the comparator, then the plaintiff will have to cite evidence supporting an inference of knowledge. But all that Mayor Langenfelder said was he didn't recall meeting either Mr. Dunn-Levy or Mr. Murray, and that's not the same thing at all as saying he didn't know what their respective races were. So I, for one, don't see why Mr. Dunn-Levy was under some obligation to introduce any evidence showing knowledge. Thank you very much for that question, Your Honor. I do think it goes right to a key issue of this case is that it is ultimately Dunn-Levy's responsibility to prove up that the mayor knew. In order to have a disparate treatment, it requires and implies a consciousness of race and a purpose to use race as a decision-making tool. If you don't have that consciousness of race, then you cannot base a decision off of race. And I think that is an important element that would ultimately have to be proven at a trial if it ever made it this far. But without any evidence to suggest that, I think creates a barrier to even make it that far. And I believe, and so now I'm going to ask this court to affirm the decision of the district court in granting the summary judgment. Okay. Anything more, anyone? No? Okay. Well, thank you very much. And we're going to bring Mr. Baker back. Okay. Thank you, Your Honor. Thank you very much. Thank you. Again, may it please the court, and very, very quickly, to your point, Judge Ripple, we never get to the pretext argument here. Pretext is something different. They never addressed the issue of pretext. They always said the argument, the issue was that we couldn't establish a prima facie case. They even have said that in their appellate brief. To the extent that they're arguing pretext, they have completely waived it. What they are doing is they are conflating Mayor Langefelder's subjective state of mind, which is something that can be used in the pretext analysis with the prima facie case analysis, which is inappropriate as this court has explained in Coleman. So we never get to the issue of pretext here. This idea that the falsifying meter readings is an immediately terminable offense, there's no basis for that in the record. The only thing that there is, there's no rule about that, there's no policy about that, there's no training manual about that, nothing. All there is was question from opposing counsel during the deposition, would this be an immediately terminable offense? And the person said yes. When I cross-examined on that, I asked them to point out situations where that had occurred. They were only able to identify, I think, one time where it had been a probationary employee. So that's an evidentiary question that can't go in their favor. We believe that the similarly situated prong, it's not a hurdle to get over, and this is a case that falls within the parameters and it should be sent back for trial. The mayor at trial can outline whatever justifications he wants, he can give his views on why he did what he did. The other point as to the knowledge of race, usually if somebody says I didn't know that this person was female or African American or Caucasian, usually you find some actual evidence of that in the form of an affidavit that would be submitted with a summary judgment record or testimony in a deposition. That didn't happen here. Not only that, the question, the answer acknowledges that the mayor himself, who was a defendant, admitted that these two were of different races. So I don't believe that that's an issue. Certainly it's not an inference that should be drawn in favor of the city at this point in time. Exceeding my time, I greatly appreciate the indulgence of the court this morning. I ask that the court reverse and remand this decision for trial. Thank you. Thank you very much. We're happy to have you both here. We're happy to have all of you here. We're just happy. All right. We're going to go on.